IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS|
EASTERN DIVISION

| | |
|---|---|
| FTI CONSULTING, INC., as Trustee of the Centaur, LLC Litigation Trust, | ) ) ) |
| Plaintiff, | ) ) ) Case No. |
| v. | ) ) |
| MERIT MANAGEMENT GROUP, LP, | ) ) ) |
| Defendant. | ) ) |

# COMPLAINT

Plaintiff FTI Consulting, Inc., in its capacity as Trustee of the Centaur, LLC Litigation Trust, brings this action against Defendant Merit Management Group, LP ("Defendant" or "Merit Management") for the avoidance and recovery of a fraudulent transfer, and respectfully states as follows:

## I.  NATURE OF THE ACTION

1. On October 30, 2007, Valley View Downs, LP ("Valley View Downs") purchased Bedford Downs Management Corporation ("Bedford Downs") by transferring $55 million to its owners, including $16,503,850 to Merit Management for its 30.007% ownership interest in the company.

2. At the time of the transfer, Bedford Downs had no revenue or assets of any worth. Bedford Downs' only "asset" of any conceivable value was its application to win the last harness racing license available in the State of Pennsylvania – a license that Valley View Downs was also pursuing. Valley View Downs essentially paid the owners of Bedford Downs $55 million to bow out of the competition.

212266_1

3. The price Valley View Downs paid, however, was objectively unreasonable because, among other things, the parties grossly overvalued both the harness racing license and Bedford Downs' application to win the license.

4. Valley View Downs received far less than reasonably equivalent value for the $55 million it paid for Bedford Downs and was insolvent at the time of the transaction. As such, at closing, Valley View Downs fraudulently transferred $55 million to the owners of Bedford Downs, to the detriment of Valley View Downs' creditors.

5. As part of the transaction, Valley View Downs fraudulently transferred $16,503,850 to Merit Management in its capacity as a 30.007% owner of Bedford Downs. The Trustee of the Centaur, LLC Litigation Trust, as assignee of the claims and causes of action pleaded herein, seeks to avoid this transfer as fraudulent pursuant to applicable state and federal law.

## II. JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action, which arises under, arises in, and relates to a case under Title 11, pursuant to 28 U.S.C. § 1334. Venue lies in this district pursuant to 28 U.S.C. § 1409.

7. This Court also has subject matter jurisdiction pursuant to (i) 28 U.S.C. § 1331 because this action arises under laws of the United States, 11 U.S.C. §§ 548 and 544; and (ii) 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and there is complete diversity of citizenship between Plaintiff and Defendant.

8. This is a core proceeding.

### III. PARTIES AND OTHER RELEVANT PERSONS AND ENTITIES

#### A. PLAINTIFF

9. Plaintiff FTI Consulting, Inc. is the duly authorized and appointed trustee to the Centaur, LLC Litigation Trust (the "Trust"), which, as explained below, was formed pursuant to the confirmed plan of reorganization (the "Confirmed Plan") in In re Centaur, LLC et al., jointly administered under the Case No. 10-10799 in the United States Bankruptcy Court for the District of Delaware (the "Centaur Bankruptcy Case").

10. Pursuant to the Confirmed Plan and the Centaur, LLC Litigation Trust Agreement, the debtors in the Centaur Bankruptcy Case, including Valley View Downs, transferred to the Trust all of their rights and interests in the "Designated Avoidance Actions," which, as defined in the Confirmed Plan, include the claims and causes of action asserted herein.

#### B. DEFENDANT

11. Merit Management Group, LP is a limited partnership with its principal place of business located at 760 Village Center Drive, Suite 200, Burr Ridge, Illinois, 60527. Merit Management was a 30.007% owner of Bedford Downs, and as such, received a $16,503,850 fraudulent transfer from Valley View Downs on October 30, 2007, in connection with Valley View Downs' purchase of Bedford Downs.

#### C. THE CENTAUR DEBTORS

12. On October 28, 2009, Valley View Downs and Centaur PA Land, LP, Pennsylvania limited partnerships, filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. Valley View Downs and Centaur PA Land, LP are wholly owned subsidiaries of Centaur, LLC ("Centaur LLC").

13. On March 6, 2010, Centaur LLC and twelve of its wholly owned subsidiaries also filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. The bankruptcy cases of these debtors, along with the bankruptcy cases of Valley View Downs and Centaur PA Land, are jointly administered before the Honorable Kevin J. Carey under Case No. 10-10799.

14. Centaur LLC and its subsidiaries are domestic horse racing, off-track betting, and casino operators. At the time of their bankruptcy petitions, Centaur LLC and its subsidiaries owned, operated, and had interests in racing and casino facilities in Indiana and Colorado, and also had a project in-progress in northwest Pennsylvania.

15. At the time that it filed for bankruptcy, Valley View Downs owned a harness racing license and intended to develop a race track with a casino — commonly referred to as a "racino" — to be known as "Valley View Downs," in Lawrence County, Pennsylvania, 55 miles northwest of Pittsburgh. Valley View Downs filed for bankruptcy after failing to secure a required gaming license in the time allotted under the terms of various loan agreements.

### IV. FACTUAL BACKGROUND

#### A. VALLEY VIEW DOWNS AND BEDFORD DOWNS COMPETE FOR PENNSYLVANIA'S LAST HARNESS RACING LICENSE

16. Pennsylvania State Harness Racing Commission (the "Commission") for the State's last available harness racing license. Shortly thereafter, in early 2003, Bedford Downs submitted an application to the Commission for the same license.

4

17. The policy of the Commission was to treat applicants as a comparative group, which effectively required the applicants to compete against each other for the only license available. Both applicants submitted detailed proposals to the Commission to construct and operate a so-called, "racino" – a racing facility that had slot machines on the premises.

18. The Commission, however, only had the power to issue harness racing licenses. Therefore, whichever applicant won the harness racing license had to take the further step of applying for and winning a Category 1 Slot License ("Gaming License") from a different administrative body – the Pennsylvania Gaming Control Board (the "Gaming Board") – before it could build its proposed racino.

19. The viability of Valley View Downs' proposal depended upon it obtaining a Gaming License because the majority of its projected revenue derived from the operation of slot machines. Without the Gaming License, the Valley View Downs project was not economically viable.

20. Under the Pennsylvania Gaming Act, holding a harness racing license satisfies a condition precedent to receiving a Gaming License, but it does not guarantee that the holder will receive one. Therefore, winning the harness racing license only represented one step in the path toward building a racino. The winner would still have to jump through several more administrative hoops and risk substantial additional time and money with no guarantee that its racino would ever become a reality.

B. **THE COMMISSION REJECTS BOTH APPLICATIONS**

21. On November 5, 2005, the Commission unanimously rejected both Valley View Downs' and Bedford Downs' applications because it had concerns with both of their proposals.

22. The Commission rejected Valley View Downs' application because of certain concerns that it had with Valley View Downs' proposed site and facility design.

23. The Commission rejected Bedford Downs' application because, among other things, it lacked confidence in Bedford Downs' proposed financing.

24. Both parties appealed the Commission's decision and the matter eventually made its way to the Supreme Court of Pennsylvania (the "Supreme Court").

25. On July 2, 2007, the Supreme Court upheld the Commission's denial of both applications but expressly provided both applicants with the opportunity to cure any deficiencies in their original applications and re-apply.

26. The Commission, however, still had no obligation to award the license to either applicant. Pursuant to a Statement of Policy issued by the Commission in 2003, the Commission was not obligated to issue any license despite the fact that a license was available.

### C. VALLEY VIEW DOWNS BUYS OUT BEDFORD DOWNS

27. After the Supreme Court issued its opinion, Valley View Downs decided that it could increase its chances of winning the license by buying out the competition while at the same time addressing some of the deficiencies the Commission found in its original application.

28. To this end, Valley View Downs approached the principals of Bedford Downs and proposed a buyout. As a result of the brief negotiation that followed, Bedford Downs and Valley View Downs entered into an agreement whereby Bedford Downs agreed to withdraw its application, and, if Valley View Downs was awarded the license, it would buy Bedford Downs for $55 million. In addition, Valley View Downs

6

agreed to purchase the property that Bedford Downs had chosen for its racino for $20 million. According to the terms of the deal, Valley View Downs would continue with its application as the sole applicant and substitute the Bedford Downs property (the "Lawrence County Land") for the site that Valley View Downs had originally chosen.

29. The Commission eventually awarded Valley View Downs a license to build a racetrack on the Lawrence County Land. Valley View Downs then closed the deal to purchase Bedford Downs on October 30, 2007, by transferring $55 million dollars to its owners, including $16,503,850 to Merit Management.

30. Valley View Downs' fatigue with the application process and its apparent over-eagerness to win the harness racing license resulted in it making an objectively unsound business decision.

31. Even assuming that Valley View Downs would eventually be awarded the Gaming License it needed to open its proposed racino – a license it never managed to obtain – the project was not a sound investment with the inclusion of the additional $55 million debt Valley View incurred as a result of its purchase of Bedford Downs.

32. More importantly, this deal resulted in Valley View Downs fraudulently transferring $55 million dollars to the owners of Bedford Downs to the detriment of all of Valley View Downs' present and future creditors because (i) Valley View Downs was insolvent at the time of the transfer; and (ii) Valley View Downs significantly overpaid for Bedford Downs and, as such, did not receive anywhere near fair consideration or reasonably equivalent value in the transaction.

### D. BEDFORD DOWNS WAS WORTH SIGNIFICANTLY LESS THAN $55 MILLION AT THE TIME OF THE TRANSFER

33. Bedford Downs had no streams of revenue and its assets were limited to the following: state trademarks and logos, corporate books and records, architectural renderings, market studies, professional services related to licensing, and a website. As its assets were of limited, if any, value on the date of the transfer, any objective valuation of Bedford Downs would have put its net worth at a number far below $55 million by October 30, 2007.

34. Valley View Downs essentially paid $55 million dollars for a valueless company. The sole purpose of the transaction was to remove Bedford Downs from the competition for a license that only represented a single step in the long and risky process of opening and operating a racino in Pennsylvania.

35. Under any legitimate valuation methodology, the $55 million dollar price tag for Bedford Downs was objectively unreasonable at the time Valley View Downs purchased it. As such, the $16,503,850 Valley View Downs transferred to Merit Management for its 30.007% ownership interest in Bedford Downs was likewise objectively unreasonable.

### E. VALLEY VIEW DOWNS FAILS TO OBTAIN THE GAMING LICENSE

36. On or around October 29, 2007 Valley View Downs submitted its application for the Gaming License to the Gaming Board. The Gaming Board was under no obligation to issue any applicant a license despite the fact that one was available. In connection with the application process, Valley View Downs had to submit to an investigation by the Gaming Board, which Valley View Downs should have understood could take up to year or more from the date of the application.

8

37. More than six months after it submitted its application, Valley View Downs still had not been granted the Gaming License. Accordingly, the complex financing package that Valley View Downs had obtained for the racino project was about to expire. Facing the prospect of losing its funding for the project, Valley View Downs requested that the Gaming Board grant it a conditional Gaming License.

38. On or around July 10, 2008, the Gaming Board unanimously denied Valley View Downs' request for a conditional Gaming License, stating that it needed additional time to complete its investigation. Valley View Downs never received the Gaming License and filed for bankruptcy on October 28, 2009.

39. In sum, at the time of Valley View Downs' $55 million transfer to the owners of Bedford Downs, there was absolutely no guarantee that Valley View Downs would be awarded the Gaming License it needed to open its racino. Even if Valley View Downs had received the Gaming License, the project was no longer economically viable due to the massive additional debt it took on to buy out Bedford Downs in its bid to win the harness racing license.

**F. VALLEY VIEW DOWNS FILES FOR BANKRUPTCY**

40. On October 28, 2009, Valley View Downs filed a petition for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Delaware.

41. As part of the bankruptcy proceeding, Valley View Downs' rights to the harness racing license, together with the Lawrence County Land, were sold to the highest bidder, American Harness, for $5.6 million – a small fraction of the $55 million Valley View Downs paid just to eliminate Bedford Downs as a competitor for the license.

42. Because Valley View Downs did not receive reasonably equivalent value in exchange for its $55 million transfer to the owners of Bedford Downs and was insolvent at the time of the transfer, the Trust seeks to avoid the $16,503,850 transfer to Merit Management for its 30.007% ownership interest in Bedford Downs as a fraudulent transfer under both the Bankruptcy Code and applicable state fraudulent transfer law.

## V.     CAUSES OF ACTION

### COUNT ONE: AVOIDANCE OF FRAUDULENT TRANSFER
### (11 U.S.C. §548(A)(1)(B))

43. Plaintiff repeats and re-alleges the allegations set forth in all preceding paragraphs of this Complaint, as if set forth in full here.

44. Valley View Downs transferred $16,503,850 to Merit Management on October 30, 2007, in exchange for its 30.007% ownership interest in Bedford Downs (the "Fraudulent Transfer").

45. The $16,503,850 that Valley View Downs transferred was property in which Valley View Downs had an interest.

46. At the time of the Fraudulent Transfer, Bedford Downs had little to no net worth, and in any event, was worth significantly less than $55 million dollars. The conclusions drawn by both Valley View Downs and Bedford Downs concerning the value of Bedford Downs at the time of the transfer were objectively unreasonable.

47. The parties also vastly overvalued the harness racing license. Receipt of the harness racing license was merely one step in the path to building a racino and it provided no guarantee that Valley View Downs would be able to complete the project. Valley View Downs' ability to build the racino was contingent upon numerous factors, most notably, its receipt of the Gaming License. Because Valley View Downs'

10

ability to build the racino was uncertain and contingent upon factors outside of its control, it was objectively unreasonable for Valley View Downs to pay $55 million to buy out the owners of Bedford Downs for the sole purpose of getting them out of the competition for the harness racing license.

48. For these and other reasons, Valley View Downs did not receive reasonably equivalent value for the Fraudulent Transfer.

49. Valley View Downs was insolvent at time of the Fraudulent Transfer because, among other things, its liabilities far exceeded its assets when the transfer was made.

50. Accordingly, the Fraudulent Transfer is avoidable under 11 U.S.C. § 548(a)(1)(B) and recoverable under 11 U.S.C. § 550.

51. As a result of the Fraudulent Transfer, Valley View Downs' creditors have been damaged in an amount to be determined at trial.

### COUNT TWO: AVOIDANCE OF FRAUDULENT TRANSFER
### (11 U.S.C. § 544 & PENNSYLVANIA UNIFORM FRAUDULENT TRANSFER ACT § 5105)

52. Plaintiff repeats and re-alleges the allegations set forth in all preceding paragraphs of this Complaint as if fully set forth herein.

53. The Fraudulent Transfer is avoidable under Pennsylvania law by actual creditors holding allowable unsecured claims against Valley View Downs.

54. At the time of the Fraudulent Transfer, Valley View Downs had one or more creditors with claims totaling more than $55 million.

55. Accordingly, the Fraudulent Transfer is avoidable under 11 U.S.C. § 544(b) and § 5105 of the Pennsylvania Uniform Fraudulent Transfer Act.

56. The Trustee may recover the avoided transfer under 11 U.S.C. § 550 and § 5107 of the Pennsylvania Uniform Fraudulent Transfer Act for the benefit of the estate and its creditors.

57. As a result of the Fraudulent Transfer, Valley View's creditors have been damaged in an amount to be determined at trial.

## VIII. REQUEST FOR RELIEF

THEREFORE, Plaintiff respectfully prays for judgment in Plaintiff's favor, and against the Defendant as follows:

a) Avoiding as fraudulent the $16,503,850 transfer to Defendant;

b) Awarding Plaintiff the recovery of the property transferred;

c) Awarding Plaintiff its reasonable attorneys' fees and costs incurred in the prosecution of this action to the extent allowed by law or equity; and

d) Awarding Plaintiff prejudgment and post-judgment interest at the highest rates allowed by law or equity;

e) Granting Plaintiff such other and further relief, at law or equity, as the Court determines is just and appropriate.

Dated: October 27, 2010                     Respectfully submitted,


/s/ Jason M. Rosenthal
One of the Attorneys for the Trustee

William T. Reid IV* (breid@rctlegal.com)
Joshua J. Bruckerhoff* (jbruckerhoff@rctlegal.com)
Gregory S. Schwegmann* (gschwegmann@rctlegal.com)
REID COLLINS & TSAI LLP
4301 Westbank Drive
Building B, Suite 230
Austin, Texas 78746
Tel.: 512-647-6100
Fax: 512-647-6129

*AND*

Jason M. Rosenthal (rosenthal@sw.com)
Marcus D. Fruchter (fruchter@sw.com)
SCHOPF & WEISS LLP
One South Wacker Drive, 28th Floor
Chicago, IL 60606
Tel.: 312-701-9300
Fax: 312-701-9335

(*Pro Hac Vice Applications To Be Filed.)